THE STATE EX REL. DAYTON FOODS LIMITED PARTNERSHIP,
APPELLANT, *v.* UNGER ET AL., APPELLEES.

[Cite as *State ex rel. Dayton Foods Ltd. Partnership v. Unger,* 104 Ohio St.3d 299, 2004-Ohio-6556.]

(No. 2004–0290—Submitted October 12, 2004—Decided December 15, 2004.)

**Per Curiam.**

{¶ 1} Appellee-claimant, Joseph Unger, was the bakery manager for a store owned by appellant, Dayton Foods Limited Partnership, a self-insured employer. He was hurt on June 7, 2000, when a cabinet weighing over 100 pounds fell on him. Dayton Foods unsuccessfully contested the resulting workers' compensation claim, which was ultimately allowed for "left shoulder/arm sprain, left shoulder AC arthralgia with evidence of rotator cuff tendonitis and impingement

syndrome." Since that time, Dayton Foods has contested surgical treatment and temporary total disability compensation ("TCC") at almost every turn. Facts relating to Unger's attempts to get surgical treatment and TCC overlap, making a strictly chronological recitation of the facts impractical. Instead, we will set forth the facts relating to each issue separately, bringing them together only as they merge administratively and judicially.

### Surgical–Treatment Authorization

{¶ 2} On December 7, 2000, Unger was examined, at Dayton Foods' request, by Dr. Jose Chavez. Confining his exam to what was then the only allowed condition—left shoulder/arm sprain—Dr. Chavez did not comment on Unger's rotator cuff. He felt that Unger's allowed condition had reached maximum medical improvement ("MMI") and attributed Unger's continuing left-arm difficulties to a cervical disc condition.

{¶ 3} Dr. Chavez's determination that Unger's left shoulder sprain had reached MMI was apparently the impetus for Dayton Foods' refusal thereafter to authorize further treatment. From at least February 2001, Unger's physician, Dr. Kevin Paley, suspected that Unger's rotator cuff had also been injured and made repeated requests for authorization of an MRI. Dayton Foods denied those requests.

{¶ 4} On June 19, 2001, Unger was examined by Dr. Wayne C. Woodard. Dr. Woodard also suspected a rotator-cuff injury and recommended an MRI. He also believed that Unger had not reached MMI.

{¶ 5} On June 28, 2001, appellee Industrial Commission of Ohio held a hearing. Authorization for an MRI followed those proceedings, and the procedure was performed on August 14, 2001. The administering doctor concluded:

{¶ 6} "A small subchondral cyst is seen in the posterior humeral head. No bone marrow edema is seen to suggest bone contusion or fracture. No significant joint effusion is noted. A type I acromion process is present. No significant left acromioclavicular joint hypertrophy is seen. The tendon of the long head of the biceps muscle is in its expected location, in the bicipital groove. The glenoid labrum is grossly intact. No rotator cuff tear is identified. There is a 9.0 × 7.0 × 5.0 millimeter object noted along the anterior aspect of the humeral head, the signal characteristics of which follow those of bone, possibly representing a loose body."

{¶ 7} On October 18, 2001, the administering doctor submitted this addendum to the MRI report:

{¶ 8} "I have been asked by Dr. Paley to review this examination with specific attention to the possibility of rotator cuff tendonitis rather than a tear. On further review of the examination, there is some minimal low-grade signal

abnormality seen in the mid-fibers of the supraspinatus tendon consistent with tendonosis. This could represent mild tendonitis or tendon degeneration."

{¶ 9} This addendum later triggered Dayton Foods' assertion that Dr. Paley had pressured the MRI radiologist into finding some evidence of rotator-cuff injury.

{¶ 10} Dr. Paley's office notes from autumn 2001 recommend an arthroscopic evaluation of the shoulder, a surgical decompression, and removal of the loose body shown on the MRI. On October 29, 2001, Dr. Paley asked Dayton Foods to authorize these procedures.

{¶ 11} In response, Dayton Foods had Unger examined by Dr. Steven Wunder on November 6, 2001. Dr. Wunder believed that surgery was unnecessary, writing:

{¶ 12} "It is my understanding this claim has been recognized and allowed for a left shoulder strain, left shoulder rotator cuff tendonitis, and left shoulder rotator cuff tear. I believe these conditions from the industrial injury have resolved. The MRI scan was unremarkable for a rotator cuff tear. There was no evidence of impingement on the MRI, and there was a type I acromion and no AC joint hypertrophy. Furthermore, I do not believe that the loose body was related to the industrial injury. Quite clearly, there was no evidence of a bone contusion, fracture or joint effusion to suggest trauma as the cause of the loose body."

{¶ 13} From that point, dueling medical reports came to the forefront. On December 21, Dr. Paley responded to Dr. Wunder's report:

{¶ 14} "In reviewing Dr. Wunder's medical report, I do not follow his line of reasoning. Dr. Wunder accurately describes the history of the injury as well as the subsequent care. On the evaluation by Dr. Wunder, Mr. Unger clearly continues to be quite symptomatic. According to Dr. Wunder's physical examination, Mr. Unger has rotator cuff impingement signs. He also has painful range of motion of the left shoulder. Dr. Wunder does not adequately assess the integrity of the rotator cuff with resisted testing.

{¶ 15} "It is obvious based on the examination by Dr. Wunder that Mr. Unger continues to be quite symptomatic with evidence clinically of rotator cuff tendonitis. This corresponds well with the MRI findings that were previously obtained on Mr. Unger's left shoulder. His examination also corresponds well with multiple other physical examinations including that of myself and Dr. Woodard who like myself is a Board Certified Orthopedic Surgeon with great expertise in the examination of shoulder injuries. I do not understand how Dr. Wunder can state that Mr. Unger's conditions from the industrial injury have resolved when

he has such continued clinical findings of left shoulder pain, weakness, and impingement signs.

{¶ 16} "* * *

{¶ 17} "I also take exception with Dr. Wunder's assessment that the MRI does not show any evidence of a bone contusion, joint effusion, or evidence of acute trauma. The MRI was obtained on August 14, 2001, which is approximately 14 months after the injury. Anybody with any reasonable medical training should know that an MRI obtained 14 months after an acute injury will not show acute evidence of an injury to the bone such as a bone contusion, fracture, or joint effusion. Mr. Unger was found to have a large loose body within the shoulder joint on the MRI of August 14, 2001. Individuals do not just have loose bodies within the shoulder. A specific injury must occur to cause a loose body to form. Mr. Unger has no past history of problems with the left shoulder prior to the accident of June 7, 2000. The mechanism of injury of a large shipping cabinet falling on him could, in my opinion, be the source of this loose body in addition to the injury to the rotator cuff.

{¶ 18} "I am quite concerned, having reviewed many of Dr. Wunder's independent medical examinations over the year, about the accuracy of his assessment with regard to the injured worker. I have not had the pleasure of reviewing an independent medical examination by Dr. Wunder where he does not come to the conclusion where the patient has reached maximum medical improvement. Mr. Unger categorically has not reached maximum medical improvement because he continues to be quite symptomatic and has not completed care. He has failed extensive conservative treatment and requires a surgical procedure in order to be maximally medically improved. Dr. Wunder's own physical examination findings support this conclusion."

{¶ 19} Dr. Wunder answered on February 5, 2002:

{¶ 20} "Dr. Paley appears to express hostility towards anyone that disagrees with his opinions. Relative to Mr. Unger or any other workers' compensation claimant that I see, we try to follow evidence-based medicine. The physicians that saw him at or near the time of injury felt that his condition was coming from the cervical spine. There was no rotator cuff tear noted on his MRI. Dr. Paley apparently requested the radiologist to re-read the MRI and they [sic] indicated that there was only a minimum low-grade signal abnormality in the mid fibers of the supraspinatus tendon compatible with tendinosis or degeneration. This is not an unusual finding in a 47–year–old male and would not be considered traumatic. His MRI scan showed no evidence of impingement nor did it document a rotator cuff tear.

{¶ 21} "My opinion is unchanged after reviewing Dr. Paley's December 21, 2001, report. The rotator cuff was intact with resisted testing. Dr. Paley

obviously did not read my report as I noted normal strength around the shoulder girdle region on several occasions. He indicated surgery was needed so that he could return to work and be a productive member of society. He has been able to continue to work. In fact he worked for a year until he saw Dr. Paley.

{¶ 22} "I don't believe an arthroscopic exploration would be indicated or necessary for the patient's industrial injury. A subacromial decompression would not be indicated or necessary for the allowed conditions or his industrial injury."

{¶ 23} On March 8, 2002, Dr. Paley followed up:

{¶ 24} "I have reviewed for a second time Dr. Wunder's physical examination and conclusions on Mr. Unger dated November 6, 2001. Within his physical examination Dr. Wunder does indicate that there are impingement signs about Mr. Unger's left shoulder. He also states that he has pain with resisted strength testing about the left shoulder. Both of these are indicative of an injury to the rotator cuff. I do not see how Dr. Wunder can, therefore, conclude that the patient has a normal rotator cuff.

{¶ 25} "It is still my opinion as a Board certified orthopedic surgeon with Fellowship training in shoulder surgery that Mr. Unger has an injury to the rotator cuff consisting of left shoulder rotator cuff tendonitis. This was seen on the MRI. This should not be considered age-related changes as discussed in Dr. Wunder's letter. Certainly MRI findings in conjunction with clinical findings seen on Mr. Unger's examination should lead to the conclusion that Mr. Unger has sustained an injury to the rotator cuff and requires the previously-requested surgery.

{¶ 26} "I would like you to know that I have no hostility towards Dr. Wunder as alluded to in his letter. I am, however, obligated to be my patient's advocate; and I do not appreciate the significant delay in treatment for Mr. Unger based on what I feel are inaccurate conclusions by Dr. Wunder."

{¶ 27} Dayton Foods had by this time denied surgical-treatment authorization, prompting Unger to move the commission for a hearing. The procedural course before the commission and court of appeals will be set forth shortly.

### The TTC Controversy

{¶ 28} While Dr. Paley was attempting to secure approval for an MRI, Unger was receiving TTC. On April 26, 2001, Unger submitted a C–84 form on which Dr. Paley had certified that Unger's temporary total disability would last through June 26, 2001. The next day, Dayton Foods faxed a letter to the doctor:

{¶ 29} "This letter is in response to the disability slip that Joseph Unger submitted on April 26, 2001.

{¶ 30} "We have an aggressive return to work policy and actively attempt to return individuals to work within the work restrictions placed upon them. It is our belief that this policy is in the best interest of the employee as it allows them to return to work that is within their restrictions without losing any compensation.

{¶ 31} "As such, we are requesting that you complete and return the attached Attending Physician Report as soon as possible.

{¶ 32} "I believe we have a great opportunity to return Joseph to work, when considering he is in a manager's position and we have many options to consider in adapting any restrictions."

{¶ 33} Just seven days later, on May 3, 2001, Dayton Foods sent a second fax:

{¶ 34} "I am sending you this letter to once again request that you complete the Attending Physician Report for Joseph Unger that was faxed to you on April 27, 2001 * * *. Your delay in responding to this request is directly impacting Mr. Unger's compensation.

{¶ 35} "I want to again emphasize that we have an aggressive return to work policy and actively attempt to return individuals to work within the work restrictions placed upon them. It is our belief that this policy is in the best interest of the employee as it allows them to return to work that is within their restrictions without losing any compensation.

{¶ 36} "When you take into consideration that his allowed condition and/or your request for additional conditions, all involve his left shoulder, I am certain that Mr. Unger can return to work as a manager with restrictions that allow for these conditions."

{¶ 37} On May 7, 2001, Dr. Paley faxed two documents to Dayton Foods. The first was a copy of Dayton Foods' May 3rd fax, upon which Dr. Paley had written the following:

{¶ 38} "You are the one delaying compensation and treatment for Mr. Unger— NOT ME. Kindly approve the previously requested treatment plan. Mr. Unger probably would have returned to work by now *if you would approve treatment.*" (Emphasis sic.)

{¶ 39} The second document was the completed "Attending Physician's Report of Injury/Status" that Dayton Foods had requested. It restricted Unger to sedentary work but also contained the notation "off work through 6/26 until treatment approved."

{¶ 40} Dayton Foods responded the next day:

{¶ 41} "This letter is in response to your fax of May 7, 2001.

{¶ 42} "*First*, we are not denying treatment to Mr. Unger. The treatment that you are referring to can proceed and be submitted for approval through our medical insurance plan, Anthem.

{¶ 43} "At this time, further treatment under the workers' compensation claim cannot be approved. This is based on the determination that Mr. Unger was at maximum medical improvement as of the independent medical examination of December 7, 2000.

{¶ 44} "*Second*, Mr. Unger can return to work as the Bakery Manager under the restrictions you placed on the Attending Physician's Report, faxed on May 7, 2001.

{¶ 45} "This work would require him to sit at his desk working with his computer. His job duties while at his desk would consist of:

{¶ 46} "1. Completion of the action plan projects given to him on April 26, 2001.

{¶ 47} "2. He would also be responsible for completing the weekly work schedules of all the bakery employees.

{¶ 48} "3. He would also be responsible for scheduling all store orders in the production schedule per order delivery requirements.

{¶ 49} "He would also need to attend management meetings as scheduled.

{¶ 50} "These job requirements comply with all the restrictions that you indicated on the 5/7/01 report. The company will comply and will require Mr. Unger to comply with the restrictions contained within the 5/7/01 report.

{¶ 51} "Please respond back to me by Friday, May 11, 2001, indicating your acceptance of the job modifications as outlined above." (Emphasis sic.)

{¶ 52} There is no evidence that Dr. Paley responded to this letter.

{¶ 53} Unger saw Dr. Paley on May 24. Dr. Paley's notes from that visit indicate the following:

{¶ 54} "The patient continues to require an arthroscopic subacromial decompression. The patient's caseworker refuses to allow an MRI of the shoulder. I will submit another request for the arthroscopic subacromial decompression and hopefully with the independent medical examination findings we can proceed with appropriate treatment for the patient. The patient cannot work at this time due to his symptoms and I will extend his disability through June 26, 2001. I am quite frustrated with the delay inappropriate [sic] treatment for this patient. The patient could have return[ed] to work at this time if his treatment had been approved [in] a timely fashion. I will reassess the patient in three weeks time."

{¶ 55} That same day, Dr. Paley wrote to Dayton Foods:

{¶ 56} "I've had the pleasure of evaluating Mr. Joseph Unger for his injured left shoulder. He continues to be symptomatic and requires an arthroscopic

subacromial decompression of the shoulder. As you know, numerous attempts have been made to proceed with an MRI of the shoulder in order to amend his claim to the correct diagnosis of left shoulder rotator cuff tendinitis. To date, all request[s] have been denied. Until appropriate treatment is allowed for Mr. Unger I will keep him off work. He is not able to perform light-duty of any kind. Kindly approv[e] treatment for Mr. Unger. As I previously discussed with you, Mr. Unger could have return[ed] to work full duty if his treatment plan had not unnecessarily been delayed."

{¶ 57} Despite Dr. Paley's indication that he would not release Unger to work until an MRI and other treatment was authorized, Dayton Foods focused on Dr. Paley's April 26, 2001 C–84 form that listed an estimated return-to-work date of June 26, 2001. Unger—following Dr. Paley's instructions—did not return to work on that date, and Dayton Foods sent the following letter to him the next day:

{¶ 58} "This letter is to notify you that you have failed to return to work after a leave of absence (return to work date of June 27, 2001).

{¶ 59} "Company policy states that failure to return to work after a leave of absence is considered a voluntary quit.

{¶ 60} "Also, company policy states that being absent without reporting for three (3) consecutive workdays is considered an automatic quit.

{¶ 61} "You must contact me by 8 AM, Eastern Standard Time, Friday, June 29th, 2001, or you will be subject to these policies."

{¶ 62} Unger was not terminated on the 29th. Perhaps the reason was that a commission hearing was held the previous day, at which an MRI was authorized based on Dr. Paley's reports and reports by Dr. Woodard, who concurred in Dr. Paley's findings.

{¶ 63} On July 6, 2001—before Unger had had an MRI—a Dayton Foods representative sent another letter to Dr. Paley:

{¶ 64} "I am sending you this letter per the results of the hearing of June 28, 2001.

{¶ 65} "*First,* the request for the MRI is approved. * * *

{¶ 66} "*Second,* the offer to return Mr. Unger to work as the Bakery Manager per the restrictions you placed on the Attending Physician's Report, faxed on May 7, 2001 is still available.

{¶ 67} "Again, this work would require him to sit at his desk working with his computer. His job duties while at his desk would consist of:

{¶ 68} "1. Completion of the action plan projects given to him on April 24, 2001.

{¶ 69} "2. He would also be responsible for completing the weekly work schedules of all of the bakery employees.

{¶ 70} "3. He would also be responsible for scheduling all store orders in the production schedule per order delivery requirements.

{¶ 71} "He would also need to attend management meetings as scheduled.

{¶ 72} "These job requirements comply with all of the restrictions that you indicated on the 5/7/01 report. The company will comply and will require Mr. Unger to comply with the restrictions contained within the 5/7/01 report.

{¶ 73} "If Mr. Unger's restrictions have changed, please forward the new restrictions to me as soon as possible. I have attached a new Attending Physician's Report for your convenience if it is needed.

{¶ 74} "I want to again emphasize that we have an aggressive return to work policy and actively attempt to return individuals to work within the work restrictions placed upon them.

{¶ 75} "Your help in this matter is deeply appreciated. Please respond by Friday, July 13, 2001." (Emphasis sic.)

{¶ 76} It is unclear whether Unger was receiving TTC at the time Dayton Foods sent this letter, and it is also unclear whether Unger knew that he still had a job to return to after Dayton Foods' June 29, 2001 deadline had passed. In any event, by July 11, 2001, he was living in another state. On July 11, 2001, he reported to Dr. Paley for reevaluation. Office notes from that visit reflect the following:

{¶ 77} "HISTORY OF PRESENT ILLNESS: Joseph is here for evaluation of his left shoulder. He has been approved for a left shoulder MRI. He is currently living in St. Louis, Missouri due to his financial situation. He continues to be symptomatic with complaints of left shoulder pain. He is unable to relocate back to Dayton at this time because of his financial situation. He is currently living with family. He has not received any disability or back pay.

{¶ 78} "PHYSICAL EXAMINATION: Examination shows good shoulder range of motion but pain at the extremes. He has positive impingement signs. He has moderate rotator cuff weakness. He is neurologically intact in the upper extremity and cervical neck examination was unremarkable. He has no instability about the shoulder. There is no evidence of infection. There is no tenderness about the acromioclavicular joint biceps tendon.

{¶ 79} "* * *

{¶ 80} "DISPOSITION AND PLAN: I would like to proceed with MRI of the left shoulder. At this time Joseph is unable to return to work at his former place of employment in Dayton, Ohio due to his financial situation. I would like to

reassess the patient in three weeks time after the MRI when he will be back in town."

{¶ 81} Dayton Foods apparently read those notes to mean that Dr. Paley was attributing Unger's inability to work to Unger's relocation, rather than his injury. Dayton Foods sent claimant this letter:

{¶ 82} "Based upon Dr. Paley's office notes of July 11th, 2001, you are required to report to work and perform the duties of Bakery Director.

{¶ 83} "It is clear from Dr. Paley's office notes that you are now physically able to perform the duties of Bakery Director, as outlined in the May 8, 2001 letter to yourself and Dr. Paley.

{¶ 84} "Joe, if you do not return to work by 8 AM on Monday, August 6th, 2001, then it shall be determined that you voluntarily quit your position and your employment will be terminated."

{¶ 85} Unger did not respond, and on August 8, Dayton Foods made good on its threat to terminate his employment.

### Commission and Court of Appeals Proceedings

{¶ 86} On July 23, 2001, Dayton Foods moved to terminate TTC "due to the treating physician's failure to respond to light duty job offer." A district hearing officer ("DHO") denied Dayton Foods' motion on October 10, 2001:

{¶ 87} "The employer argued that temporary total disability compensation should be terminated because the physician of record had not responded to the employer's request to certify light duty employment. The employer further argued that the claimant voluntarily terminated his employment on 08/06/2001 and that the claimant is currently receiving treatment for unallowed conditions.

{¶ 88} "The physician of record's failure to adequately respond to the self-insured employer does not constitute a basis to terminate temporary total disability compensation. The District Hearing Officer notes that Dr. Paley, the physician of record, stated that claimant could not perform any work until an MRI is performed. An MRI was not obtained until 08/14/2001. The District Hearing Officer further notes that on C–84s dated 06/14/2001 and 08/12/2001 Dr. Paley indicated that claimant could not perform any light duty employment. Thus, even though the employer may be able to adhere to any medical restrictions, there is simply no evidence from a medical provider that the claimant can return to such work.

{¶ 89} "Next, the employer argued that they offered employment to the claimant on 07/26/2001 and that claimant's failure to respond resulted in his voluntary termination on 08/06/2001. The District Hearing Officer disagrees. Again, the medical documentation does not indicate that the claimant can return

to restricted work. As such, the claimant's absence from the work force is not voluntary, but due to the allowed conditions in the claim.

{¶ 90} "Finally, the employer argued that claimant is receiving treatment for conditions not allowed in the claim. The medical documentation that the employer apparently relies upon was not supplied to the claim. The District Hearing Officer has no medical documentation to make such a conclusion. Neither the 08/14/2001 MRI nor any office notes from Dr. Paley beyond 07/11/2001 are on file.

{¶ 91} "Accordingly, the District Hearing Officer orders the continued payment of temporary total disability compensation upon the further submission of appropriate medical evidence."

{¶ 92} A staff hearing officer ("SHO") affirmed the DHO's ruling after a November 30, 2001 hearing, with the following entry:

{¶ 93} "The employer's C–86 filed 07/25/2001 is denied. It is the finding of the Staff Hearing Officer that [Dr. Paley's] failure to respond to the employer's light duty job offer does not constitute a basis for termination of the claimant's temporary total disability compensation benefits, especially when medical evidence on file continues to clearly document the continued temporary disability of the claimant due to the 06/07/2000 industrial injury.

{¶ 94} "This order is based upon the medical reports of Dr. Paley 04/26/2001, 07/11/2001, 06/14/2001, 08/12/2001, and the evidence adduced at the hearing."

{¶ 95} Dayton Foods appealed. While that matter was pending, two more motions were filed: Unger moved for surgical-treatment authorization, and Dayton Foods filed another motion to terminate TCC, this time asserting MMI. This motion to terminate was based on the November 6, 2001 report by Dr. Wunder discussed earlier.

{¶ 96} On January 25, 2002, the commission refused to consider Dayton Foods' appeal of the SHO order denying Dayton Foods' first motion to terminate. On April 19, a DHO ruled on Unger's motion for authorization of surgery and Dayton Foods' motion to terminate TCC based on MMI. Relying on Dr. Wunder's February 5, 2002 and November 6, 2001 reports, respectively, the DHO denied surgical-treatment authorization and granted Dayton Foods' motion to terminate TTC.

{¶ 97} An SHO reversed both findings, relying on Dr. Paley's findings:

{¶ 98} "It is the finding of the Staff Hearing Officer that the claimant's request for authorization for further treatment with Dr. Paley and for orthoscopic [sic] surgery is granted. The Staff Hearing Officer finds the reports of Dr. Paley, dated 12/21/01 and 3/8/02 to be persuasive in both the claimant's need for surgery and its causal relationship to the 6/7/00 industrial injury.

{¶ 99} "Temporary total disability compensation is to continue from the date of last payment to 7/4/02, based on the C–84 from Dr. Paley dated 2/11/02 and 4/30/02."

{¶ 100} Dayton Foods' appeal of the SHO's order was refused, and Dayton Foods initiated an action in mandamus in the Court of Appeals for Franklin County. The court of appeals held that Dr. Paley's December 21, 2001 report was "some evidence" relating the loose body in Unger's shoulder to his industrial injury and that the commission, therefore, did not abuse its discretion in authorizing the operation.

{¶ 101} Addressing TTC, the court relied on R.C. 4123.56(A) and Ohio Adm. Code 4121–3–32(A) and stressed that it is a *claimant's* refusal of an offer of suitable employment, not a doctor's, that is needed to satisfy the statute's termination criteria. It also rejected Dayton Foods' assertion that Dr. Paley's C–84 forms were flawed because they prospectively certified temporary total disability.

{¶ 102} This cause is now before this court on an appeal as of right.

{¶ 103} Dayton Foods' objection to surgery has been the same throughout—lack of causal relationship between the need for surgery and the industrial injury. Its challenge to TTC, on the other hand, has alternated between three different theories. The court of appeals, through its magistrate, has done an exemplary job assembling the relevant facts and addressing the arguments accurately and succinctly. We affirm its judgment.

{¶ 104} On the issue of surgery, Dayton Foods implies that Dr. Paley is being deceptive. It accuses the doctor of requesting surgery for an allowed condition—tendonitis—when he really seeks to repair a nonallowed condition—a loose body in Unger's shoulder. This argument ignores the SHO's conclusion that the need for surgery—even if a loose body is involved—is related to the industrial injury. Dr. Paley's December 21, 2001 report states:

{¶ 105} "Mr. Unger was found to have a large loose body within the shoulder joint on the MRI of August 14, 2001. Individuals do not just have loose bodies within the shoulder. A specific injury must occur to cause a loose body to form. Mr. Unger has no past history of problems with the left shoulder prior to the accident of June 7, 2000. The mechanism of injury of a large shipping cabinet falling on him could, in my opinion, be the source of this loose body in addition to the injury to the rotator cuff."

{¶ 106} This contradicts Dayton Foods' assertion that there is no evidence causally relating the loose body to the industrial injury. Accordingly, its argument is rejected.

{¶ 107} Turning to TTC, Dayton Foods accuses Dr. Paley of being uncooperative in Dayton Foods' efforts to return Unger to light-duty work and claims that under R.C. 4123.56(A) this warrants termination of TTC. This proposition fails.

{¶ 108} R.C. 4123.56(A) provides that TTC payments "shall not be made for the period when any employee has returned to work, when an employee's treating physician has made a written statement that the employee is capable of returning to the employee's former position of employment, when work within the physical capabilities of the employee is made available by the employer or another employer, or when the employee has reached the maximum medical improvement."

{¶ 109} Ohio Adm.Code 4121–3–32(B)(2)(d) supplements the statute, allowing termination "[u]pon the finding of a district hearing officer that the employee has received a written job offer of suitable employment." "Suitable employment" is "work which is within the employee's physical capabilities." Ohio Adm.Code 4121–3–32(A)(3). "Job offer" is a "proposal, made in good faith, of suitable employment within a reasonable proximity of the injured worker's residence." Ohio Adm.Code 4121–3–32(A)(6).

{¶ 110} Dayton Foods never extended a light-duty job offer to Unger, nor did it seek termination for his failure to accept such an offer, rendering Ohio Adm.Code 4121–3–32(B)(2)(d) inapplicable. It instead maintains that it was foreclosed from extending a job offer by Dr. Paley's failure to respond to its proposed light-duty position. This assertion has three flaws.

{¶ 111} First, neither the Revised Code nor the Administrative Code lists a *doctor's* response to a proposed job offer as a termination criterion. Second, Dayton Foods' description of Dr. Paley as unresponsive is tenuous. On April 26, 2001, Unger submitted to Dayton Foods a C–84 form in which Dr. Paley prohibited Unger from working through June 26. Dayton Foods refused to accept that medical opinion and instead faxed Dr. Paley a form asking him to list Unger's medical restrictions. When Dr. Paley did not respond within one week, Dayton Foods again faxed the request. This time, Dr. Paley indicated that Unger could do sedentary work but also wrote that Unger was "off work through 6/26 until treatment approved."

{¶ 112} Dayton Foods seized upon the possibility of sedentary work and immediately wrote to the doctor and informed him that in the opinion of the Human Resources Director, Unger was medically capable of the light-duty job that Dayton Foods had proposed. Notwithstanding Dr. Paley's C–84 form and the handwritten notation, Dayton Foods requested that Dr. Paley—within the next three days—accept the Human Resources Director's medical assessment and release Unger to the light-duty job. Dr. Paley, understandably, did not answer.

{¶ 113} Contrary to Dayton Foods' representation, Dr. Paley answered Dayton Foods' requests promptly. He simply refused to allow himself to be bullied into forcing Unger back to work prematurely. Again, Dr. Paley had stated from the beginning that Unger was medically incapable of any work through June 26. The alleged factual basis for Dayton Foods' legal position does not, therefore, withstand scrutiny.

{¶ 114} Third, Dayton Foods' position would penalize Unger, by terminating his TTC, for a dispute over which he has no control. The quarrel here is between Dr. Paley and Dayton Foods. Unger should not be put in the crossfire merely because he heeded his doctor's instructions.

{¶ 115} Last, Dayton Foods mounts a technical challenge to Dr. Paley's C–84 forms, criticizing his prospective certification of disability. C–84 forms, of course, are designed to accommodate prospective certification and are often used this way, particularly where TTC is ongoing.

{¶ 116} Dayton Foods' complaint appears to be with Dr. Paley's practice of certifying disability for a two-month period, with a doctor's examination scheduled in the middle. For example, Dr. Paley saw Unger on April 16, 2001. He prepared the C–84 form on April 26, reporting that Unger was unable to work from that date through June 26. The C–84 form also indicated that Unger's next scheduled appointment was May 16. Dayton Foods apparently believes that the disability should only have been certified through May 15 with any disability finding thereafter contingent on the results of the May 16 visit.

{¶ 117} Dayton Foods' plan, however, could interrupt what should be continuous compensation. Using the dates in the example, Dayton Foods' proposed method would allow Dr. Paley to verify disability only through May 15. Then, presumably after the May 16 exam, the doctor—if Unger was still disabled—would file a new C–84 form extending the date of disability. Unfortunately, this scheme does not factor in form-preparation and processing time, which could result in a break in compensation. This explains why many doctors do exactly as Dr. Paley does: estimate a period of disability and schedule an interim visit to estimate further extension. Dayton Foods has cited no legal authority to support changing this traditional method of completing C–84 forms. We therefore decline Dayton Foods' invitation to change it.

{¶ 118} We affirm the judgment of the court of appeals.

Judgment affirmed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, O'CONNOR and O'DONNELL, JJ., concur.

LUNDBERG STRATTON, J., concurs in judgment only.

Pickrel, Schaeffer & Ebeling, David C. Korte, Michelle D. Bach, and Salvatore A. Gilene, for appellant.

Jim Petro, Attorney General, and Erica L. Bass, Assistant Attorney General, for appellee Industrial Commission.

Casper & Casper and Megan Richards, for appellee Joseph Unger.